# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SOUTHERN APPALACHIAN MOUNTAIN STEWARDS, ET AL.,** ) ) ) | | |
| Plaintiffs, ) ) | Case No. 2:16CV00026 | |
| v. ) ) | **OPINION AND ORDER** | |
| **RYAN ZINKE, SECRETARY OF THE INTERIOR,** ) ) ) | By: James P. Jones United States District Judge | |
| Defendant. ) | | |

*Walton D. Morris, Jr., Morris Law Office, P.C., Charlottesville, Virginia, and Isak Howell, Isak Howell Law Office, Roanoke, Virginia, for Plaintiffs; John Austin, Field Solicitor, Department of the Interior, Knoxville, Tennessee, and Sarah Bugbee Winn, Assistant United States Attorney, Roanoke, Virginia, for Defendant.*

In this case, I must decide whether a decision by the Secretary of the Interior denying a federal inspection of selenium levels at a surface coal mine's outfall was arbitrary and capricious. With cross motions for summary judgment before me, I find that it was, and therefore rule in the plaintiffs' favor.

I.

The plaintiffs, two environmental organizations, filed this action pursuant to the judicial review provision of the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1276(a)(2), alleging that they were aggrieved by an administrative decision of the Secretary of the Interior ("Secretary"). The

defendant answered and filed the administrative appeal record.[1]  Cross motions for summary judgment based on that record have been filed and the parties have briefed and orally argued the issues.  The case is thus ripe for decision.

A.

The Secretary, through the Office of Surface Mining Reclamation and Enforcement ("OSMRE"), administers SMCRA.  *See* 30 U.S.C. 1211.  Virginia is a primacy state, meaning it has its own state-run, federally approved program for surface mining reclamation operations, but OSMRE retains some enforcement powers.  *See* 30 U.S.C. § 1271.  Federally approved state programs must "incorporate sanctions no less stringent than" those set forth in SMCRA and "shall contain the same or similar procedural requirements relating thereto."  30 U.S.C. § 1271(d).

When the Secretary has reason to believe someone is violating a SMCRA requirement or permit condition, the Secretary must notify the state regulatory agency by issuing what is known as a ten-day notice.  30 U.S.C. § 1271(a)(1).  If the state agency does not, within ten days, "take appropriate action to cause said violation to be corrected or to show good cause for such failure and transmit notification of its action to the Secretary, the Secretary shall immediately order Federal inspection of the surface coal mining operation at which the alleged

---

[1] The administrative appeal record will be cited as "R."

violation is occurring." *Id.* If a state fails to enforce its federally approved program, the Secretary may provide for federal enforcement. 30 U.S.C. § 1254(b).

A Virginia regulation promulgated under SMCRA's authority generally requires that "[d]ischarges of water from areas disturbed by surface mining activities shall be made in compliance with all applicable State and Federal water quality laws, standards and regulations and with the effluent limitations for coal mining promulgated by the U.S. Environmental Protection Agency set forth in 40 CFR 434." 4 V.A.C. 25-130-816.42. The Federal Water Pollution Control Act, better known as the Clean Water Act ("CWA"), prohibits the discharge of pollutants without a permit. 33 U.S.C. § 1311(a). Thus, every Virginia surface mining permit incorporates the requirement that any discharges must comply with both state standards and the CWA.

The regulation establishing Virginia's surface water standards states that "[i]nstream water quality conditions shall not be acutely or chronically toxic." 9 V.A.C. 25-260-140. The regulation defines "acute toxicity" as "an adverse effect that usually occurs shortly after exposure to a pollutant." *Id.* Death or immobilization of an organism "is the usual measure of acute toxicity." *Id.* "Chronic toxicity" is defined as "an adverse effect that is irreversible or progressive or occurs because the rate of injury is greater than the rate of repair

during prolonged exposure to a pollutant." *Id.* For selenium,[2] Virginia has set a freshwater aquatic life chronic toxicity standard of 5 µg/l (micrograms per liter, that is, 5 millionths of a gram per liter). *Id.* Chronic toxicity is measured by a "[f]our-day average concentration," which is "not to be exceeded more than once every 3 years on the average." *Id.* at n.2.

A federal regulation requires a representative of the Secretary to "immediately conduct a Federal inspection" whenever he or she

> has reason to believe on the basis of information available to him or her . . . that there exists a violation of [SMCRA], this chapter, the applicable program, or any condition of a permit or an exploration approval, or that there exists any condition, practice, or violation which creates an imminent danger to the health or safety of the public or is causing or could reasonably be expected to cause a significant, imminent environmental harm to land, air or water resources and —
>
> . . .
>
> The authorized representative has notified the state regulatory authority of the possible violation and more than ten days have passed since notification and the State regulatory authority has failed to take appropriate action to cause the violation to be corrected or to show good cause for such failure and to inform the authorized representative of its response.

---

[2] Selenium is "a naturally occurring element that can be harmful in high doses to aquatic life and is categorized as a toxic pollutant under the [CWA]." *S. Appalachian Mountain Stewards v. A & G Coal Corp.*, 758 F.3d 560, 562 (4th Cir. 2014). Surface mining operations may expose selenium-bearing earth materials. *See Ohio Valley Envtl. Coal., Inc. v. Apogee Coal Co.*, 555 F. Supp. 2d 640, 642 (S.D.W. Va. 2008).

30 C.F.R. § 842.11(b)(1). "Appropriate action includes enforcement or other action authorized under the State program to cause the violation to be corrected." *Id.* Good cause can be established where "[u]nder the State program, the possible violation does not exist." *Id.* "An authorized representative shall have reason to believe that a violation, condition or practice exists if the facts alleged by the informant would, if true, constitute a condition, practice or violation . . . ." 30 C.F.R. § 842.11(b)(2); *see also* 4 V.A.C. 25-130-842.11. "When the Federal inspection results from information provided to the Secretary by any person, the Secretary shall notify such person when the Federal inspection is proposed to be carried out and such person shall be allowed to accompany the inspector during the inspection[.]" 30 U.S.C. § 1252(e)(2). The approved Virginia program includes enforcement mechanisms essentially parallel to the federal enforcement mechanisms. *See* Va. Code Ann. §§ 45.1-245, 45.1-246.1. Like the federal statute, a Virginia statute states, "Whenever information provided the Director by any person results in any inspection, the Director shall notify such person of the time at which the inspection is scheduled to occur, and such person shall be allowed to accompany the inspector during the inspection." Va. Code Ann. § 45.1-246.1(H).

B.

In January 2014, Southern Appalachian Mountain Stewards ("SAMS") sent a letter to the Virginia Division of Mined Land Reclamation ("DMLR") requesting a citizen inspection under the Virginia regulations, of Red River Coal Company's ("Red River") Greater Wise No. 1 Mine ("GW1 Mine"), located in Wise County, Virginia. The letter alleged that the GW1 Mine was violating SMCRA by (1) discharging selenium without permit authorization in violation of the CWA, and (2) exceeding Virginia's chronic toxicity standard for selenium. The letter cited publicly available selenium sampling data from a nearby aquatic monitoring station which showed selenium levels of 19.0 µg/l, 16.9 µg/l, and 7.12 µg/l. The samples cited had been collected in November 2010, March 2011, and September 2012, respectively. The GW1 Mine's National Pollutant Discharge Elimination System ("NPDES") permit[3] contained no effluent limitations for selenium. SAMS's letter asked for notice of and an opportunity to attend any inspection.

DMLR denied SAMS's request for an inspection. DMLR's letter to SAMS stated that there could be no violation under the state regulations because the GW1 Mine's NPDES permit contained no selenium limit. The letter also noted that the permit would soon be up for renewal, and Red River would be required to address

---

[3] "[T]he CWA allows the federal government — or by delegation, the states — to issue NPDES permits for the discharge of certain pollutants." *S. Appalachian Mountain Stewards*, 758 F.3d at 563 (citing 33 U.S.C. § 1342(a), (b)).

the discharge of selenium in the renewal process. DMLR also stated that the data did not show any exceedence of the state water quality standards because the samples were taken upstream of the GW1 Mine's outfall.

SAMS did not appeal DMLR's decision through the state administrative process. Instead, pursuant to 30 C.F.R. § 842.12(a), SAMS and Sierra Club (collectively, the plaintiffs) wrote to OSMRE and requested a federal inspection of the GW1 Mine. OSMRE issued a ten-day notice, to which DMLR responded within ten days. In its response, DMLR again stated that the GW1 Mine's permit did not contain a selenium effluent limitation. DMLR said that the sampling data provided by the plaintiffs was not sufficient to show that the selenium water quality standard was exceeded because the samples were taken upstream of the permit's Outfall 001. However, SAMS had explained in its initial letter to DMLR that the sediment ponds downstream of where the samples were taken "are not designed to treat selenium and typically do not treat selenium. Therefore, the discharges from Red River's Outfall 001 likely contain levels of selenium comparable to those shown at" the location where the samples were taken. R. 2. In its response to the ten-day notice, DMLR further stated that it would require Red River to address the discharge of selenium in its upcoming permit renewal. DMLR concluded that no violation was present, so no enforcement action was required.

Two days after OSMRE issued the ten-day notice and three days before DMLR responded, OSMRE sampled water from the GW1 Mine's Outfall 001 while conducting an inspection of an adjacent mining operation. OSMRE wrote in a letter to Red River that these samples were collected in response to a citizen complaint and would be analyzed for selenium concentration. The plaintiffs were not notified that these samples would be collected and were not present for their collection. The selenium level in these samples was 5.77 μg/l, higher than Virginia's chronic toxicity level of 5 μg/l.

Considering DMLR's response to the ten-day notice, OSMRE's Knoxville Field Office ("KFO") found that the data supplied by SAMS to DMLR "does provide evidence suggestive that the chronic standards for selenium (5 μgram/liter) could be in violation." R. 23. The KFO held that "DMLR cannot choose to enforce only the NPDES standards referenced at 4VAC25-130-816.42 and ignore the requirements that discharges meet other State and Federal Laws; to do so is arbitrary, capricious, and an abuse of discretion." *Id.* The KFO thus declared that it would conduct a federal inspection of the GW1 Mine.

DMLR requested informal review of the KFO's decision by OSMRE's Regional Director. *See* 30 C.F.R. § 842.11(b)(iii)(C). DMLR contended that OSMRE had already improperly conducted a federal investigation when OSMRE took samples at Outfall 001, "under the ruse of conducting an oversight inspection"

of Red River's adjacent operation. R. 25. DMLR stated that the data provided by SAMS "did not indicate that an exceedance of any promulgated State standard existed." *Id.* A month after OSMRE had collected its samples, DMLR collected its own samples from Outfall 001. Once again, SAMS was not notified of the inspection in advance and was not present for it. These samples showed a selenium level of 4.5 µg/l. DMLR submitted the results of this sampling to the Regional Director to be considered as part of the informal review.

On review, the Regional Director reversed the KFO's decision. The Regional Director found that the KFO had rightly determined DMLR's response to the ten-day notice to be arbitrary and capricious. However, based on the later sampling done by DMLR that showed a selenium level less than the chronic toxicity level, the Regional Director concluded that there was no violation. The Regional Director acknowledged that DMLR had failed to allow SAMS to attend the inspection, but stated that "the KFO has no ability to cite an enforcement action in response to DMLR's shortcoming." R. 109.

SAMS appealed the Regional Director's decision to the Department of Interior's Office of Hearings and Appeals, Interior Board of Land Appeals ("Board"). The Board affirmed the Regional Director's decision. The Board first held that the Regional Director had not erred in finding that DMLR's response to the ten-day notice was not arbitrary or capricious because, based on DMLR's later

sampling for selenium, "there was no violation of the *acute* State selenium standard." R. 128 (emphasis added). The Board's decision did not address the chronic toxicity standard, nor did it mention the sampling done by OSMRE during its inspection of the adjacent mine.

The Board then held that SAMS's right to participate in any state inspection ended when SAMS declined to appeal DMLR's denial through the state administrative process and proceeded to request a federal inspection instead.

The Board next held that the Regional Director did not err in failing to find that Red River's discharge of selenium in any amount violated the CWA. The Board considered the Fourth Circuit's decision in *Southern Appalachian Mountain Stewards v. A&G Coal Corp.*, 758 F.3d 560, 570 (4th Cir. 2014), and noted that even if Red River were unable to avail itself of the CWA's permit shield defense as to selenium, the KFO likely would not have known about any deficiencies in the permitting process, which is done through the state agency. Therefore, any such deficiencies could not have caused the Regional Director "to believe Red River was violating the approved State program." R. 130. Finally, the Board agreed that "DMLR was . . . taking appropriate action to address a potential NPDES permitting issue" by stating that it would require Red River to address selenium discharges in its upcoming permit renewal process. *Id.* at 131.

The Board's decision is considered the final decision of the Secretary, 43 C.F.R. § 4.1101(a), and is subject to review by this court, 30 U.S.C. § 1276(a)(2).

II.

My review of the Secretary's decision must be based solely on the record that was before the Secretary. 30 U.S.C. § 1276(b). I must uphold the Secretary's findings of fact if they are supported by substantial evidence. *W. Va. Highlands Conservancy, Inc. v. Norton*, 69 F. App'x 624, 627 (4th Cir. 2003) (unpublished). The Secretary's legal conclusions shall be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[T]he distinction between the substantial evidence test and the arbitrary or capricious test is largely semantic . . . ." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984) (internal quotation marks and citations omitted).

"The arbitrary-and-capricious standard directs the reviewing court to determine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*, 473 F.3d 94, 102 (4th Cir. 2006) (internal quotation marks and citation omitted). This standard requires the agency to "explain the evidence which is available, and . . . offer a rational connection

between the facts found and the choice made." *Id.* at 102-03 (internal quotation marks and citation omitted).

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." *Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 497 (2004) (internal quotation marks and citation omitted). But I should not "supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks and citation omitted).

Following these principles, I now consider whether the Secretary's decision was arbitrary and capricious.

I find that the Board's decision entirely failed to address key evidence, and its finding that DMLR's sampling showed there was no violation of Virginia's water quality standards runs counter to the record evidence and fails to address an important aspect of the plaintiffs' complaint. The data initially provided by SAMS showed selenium levels far exceeding the Virginia chronic standard. The samples

collected by OSMRE from Outfall 001 showed selenium levels in excess of the chronic standard. The samples collected by DMLR showed selenium levels only slightly lower than the chronic standard, and the average of the samples taken by OSMRE and DMLR showed a level in excess of the chronic standard. The Board ignored all of the samples showing selenium levels in excess of the chronic standard and referenced only the sampling done by DMLR. The Board also referred to the acute standard, which was not at issue, and did not discuss the chronic standard beyond a passing reference in a footnote. The Secretary has argued to this court that the Board's reference to the acute standard was a mere typographical error, but that is not apparent from the face of the decision. Even if the reference to the acute standard was a clerical error, the Board's decision does not rationally explain how the sampling evidence of record led to the conclusion that the chronic standard was not being violated.

The data provided by SAMS gave the Secretary reason to believe that the GW1 Mine was violating Virginia's chronic toxicity standard for selenium, which is why the Secretary issued the ten-day notice. The samples collected by OSMRE after issuance of the ten-day notice provided further reason to believe a violation was occurring, as that data was both recent and collected from the GW1 Mine's outfall rather than a point upstream. DMLR's response to the ten-day notice arbitrarily concluded, based solely on its own one-day sampling data, that there

was no violation and that no inspection was warranted. As to the Virginia chronic toxicity standard, DMLR thus "failed to take appropriate action to cause the violation to be corrected or to show good cause for such failure." 30 C.F.R. § 842.11(b)(1).

The Secretary has argued that DMLR correctly concluded there was no violation of the chronic standard because the plaintiffs did not provide samples taken on four consecutive days that show an average selenium level in excess of the standard. I find that SMCRA does not require citizens to provide such evidence when seeking a federal inspection. Though the Virginia regulation does state that chronic toxicity is measured by a four-day average concentration, no citizen could reasonably be expected to obtain four consecutive days of sampling data in advance of an inspection. Citizens do not have a legal right to enter upon privately owned mining operations to collect water samples. Citizens generally must rely upon publicly available data when seeking an inspection, which is what SAMS did here.

SMCRA's "reason to believe" standard does not demand that citizens prove the existence of a violation by a preponderance of the evidence before they can obtain an inspection. Collecting evidence is the purpose of the inspection. The Board itself has explained that under SMCRA, OSMRE must order an inspection wherever the possibility of a violation exists, and the purpose of an inspection is to

determine whether or not a violation does, in fact, exist. *W. Va. Highlands Conservancy*, IBLA 95-557, 22 (2000). The evidence before the Board provided reason to believe that the GW1 Mine was violating the state chronic toxicity standard for selenium, and DMLR neither took appropriate action to correct the violation nor showed good cause for failing to take any action; therefore, the Board was required to order a federal inspection.

In addition to an alleged violation of the state chronic toxicity standard, the plaintiffs also contended that the GW1 Mine was violating the CWA by discharging any selenium without a permit authorizing it to do so. It is undisputed that at the time the various samples were taken, the mine's NPDES permit contained no effluent limit for selenium. The mine therefore was not allowed to discharge selenium in any amount unless it could avail itself of the CWA's so-called permit shield defense. The permit shield defense applies only when:

> (1) the permit holder complies with the express terms of the permit and with the Clean Water Act's disclosure requirements and (2) the permit holder does not make a discharge of pollutants that was not within the reasonable contemplation of the permitting authority at the time the permit was issued.

*S. Appalachian Mountain Stewards*, 758 F.3d at 565 (quoting *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty.*, 268 F.3d 255, 259 (4th Cir. 2001)).

The Board's decision appears to place the burden on the plaintiffs to show that the permit shield does not apply to the GW1 Mine's discharge of selenium. The Board stated:

> Discharging a pollutant not identified in an NPDES permit is not a violation of the Clean Water Act if the permittee complied with applicable disclosure requirements when applying for its NPDES permit and the pollutant was within the reasonable contemplation of the permitting authority when it issued the NPDES permit. But even if these circumstances might not be present due to NPDES permitting errors or deficiencies, we question how they would be known to KFO and cause it to believe Red River was violating the approved State program.

R. 130 (footnote omitted). The problem with this analysis is that the permit shield is a defense. *See S. Appalachian Mountain Stewards*, 758 F.3d at 570 (noting that the defendant bears the burden of proof as to the permit shield defense). The plaintiffs were not required to disprove its applicability in order to create reason to believe that the GW1 Mine was violating the CWA by discharging selenium without permit authorization. The Board's decision simply requires too much of a citizen complainant and ignores the relatively low threshold for when action must be taken or an inspection must be conducted.

Moreover, DMLR's promise to address selenium discharges in a future permit revision did not amount to appropriate action to cause the CWA violation to be corrected. Whatever a future permit might require, the record evidence gave reason to believe that the GW1 Mine was violating its NPDES permit at the time

the ten-day notice was issued. Allowing that violation to continue until some unspecified future date when the permit is renewed and revised is not appropriate action to correct the existing violation. Furthermore, DMLR concluded that no violation existed and no action was required. The Board's conclusion that addressing the issue of selenium discharge during future permit renewal constituted appropriate action to correct the potential CWA violation was arbitrary and capricious.[4]

Because I hold that the Secretary's decision was arbitrary and capricious on the grounds stated above, I need not address either party's arguments regarding the plaintiff's right to notice of and participation in the inspection conducted by DMLR. In accordance with the applicable federal regulation, the plaintiffs shall be given notice of and an opportunity to attend the federal inspection.

### III

For the reasons stated, I will grant the relief requested by the plaintiffs and direct the Secretary to conduct a federal inspection to address the allegations made by SAMS in its written citizens' complaint about Red River.

---

[4] At oral argument, counsel for the Secretary advised the court that DMLR has renewed Red River's GW1 Mine permit since the events in question in this case, and that the renewed permit addresses discharge of selenium in some undisclosed manner. That fact, even if true, does not moot the plaintiffs' case. The same permit is at issue and the citizens' complaint by SAMS offered sufficient evidence of a violation of the state's chronic selenium toxicity standard to justify an inspection, regardless of the provisions of any renewed permit.

Accordingly, it is **ORDERED** that the Motion for Summary Judgment by the plaintiffs, ECF No. 12, is GRANTED, and the Motion for Summary Judgment by the defendant, ECF No. 16, is DENIED. A separate final judgment will be entered forthwith.

        ENTER: September 20, 2017

        /s/ James P. Jones
        United States District Judge